THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CAROLYN BASORA,

Plaintiff,

v.

CORNELL STOREFRONT SYSTEMS, INC.,

Defendant.

: CIVIL ACTION NO. 3:19-CV-2028
: (JUDGE MARIANI)

FILED
SCRANTON
OCT 20 2022
PER ______
DEPUTY CLERK

**MEMORANDUM OPINION**

I. INTRODUCTION

Defendant's Motion for Summary Judgment as to All Causes of Action of Plaintiff's Complaint (Doc. 18) is pending before the Court. Plaintiff's Complaint contains three counts: Count I for Violations of the Americans with Disabilities Act ("ADA") based on "Actual/Perceived Disability Discrimination, Retaliation, and Hostile Work Environment"; Count II for Violation of Title VII based on retaliation; and Count III for Violation of Section 1981 based on retaliation. (Doc. 1 at 6-8.)

These claims arise from events which occurred in October 2019 at which time Plaintiff Carolyn Basora ("Plaintiff") had been employed by Defendant Cornell Storefront Systems, Inc. ("Defendant" "Storefront") for approximately fifteen months. Because of an incident which took place on October 3, 2019, Plaintiff alleges that she spoke with a superior about her mental health conditions and complained to superiors about coworkers' derogatory remarks about her mental health and racial slurs. On August 14, 2019, a

coworker told a supervisor that she had observed Plaintiff with a gun in the workplace. The next day, Plaintiff was terminated.

For the reasons discussed below, the Court will grant Defendants' motion.

## II. STATEMENT OF UNDISPUTED FACTS[1]

Plaintiff began working for Defendant as a Key Account Specialist in approximately July 2018. (Doc. 18-2 ¶ 1; Doc. 24 ¶ 1.) She worked on a team known as the "Red Team" which was supervised by Jeffrey Bevan. (*Id.* ¶ 3.) Other Key Account Specialists on the team included Samantha Temple, Jessica Hoover, and Stephani Gill. (*Id.* ¶ 4.)

On Thursday October 3, 2019, the local police contacted Defendant and arrived at Plaintiff's work location to do a "welfare check" on Plaintiff because her fiancé contacted the police requesting the welfare check. (*Id.* ¶ 8.) Upon arrival, the police asked Plaintiff about possessing a gun, and Plaintiff told them that she had one in the glove box of her car.[2] (*Id.* ¶ 8.) After the police left, Plaintiff spoke with Service Department Manager Kristi

---

[1] Only undisputed facts set out in Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment as to All Causes of Action of Plaintiff's Complaint (Doc. 18-2) are included in this section of the Memorandum Opinion. The Court does not consider Plaintiff's Counter-Statement of Facts (Doc. 24 at 10-40) because separate statements of fact not directly responsive to the movant's statement of facts are not contemplated by L.R. 56.1 of the Local Rules of Court of the Middle District of Pennsylvania and need not be given any evidentiary value. *See, e.g.*, *Rau v. Allstate*, Civ. A. No. 3:16-CV-359, 2018 WL 6422121, at *2 (M.D. Pa. Dec. 6, 2018), *aff'd*, 793 F. App'x 84 (3d Cir. 2019).

The parties provide citations to the record for the facts alleged. (*See* Docs. 18-2, 24.) With limited exceptions, the Court does not include these citations here.

[2] The gun was confiscated by the police, allegedly because there was an issue with registration that resulted from the state police registration and was quickly resolved. (Doc. 24 ¶ 9.)

Skoveroski, requesting to take the rest of the day off, and Skoveroski approved the leave. (*Id.* ¶ 11.)

Plaintiff asserts that during the conversation with Skoveroski she disclosed, for the first time, that she had a history of mental health issues. (*Id.* ¶ 12.) Skoveroski testified that Plaintiff did not mention anything about having a mental illness during the conversation. (*Id.* ¶ 13.)

Plaintiff returned to work the next day, Friday October 4, 2019. (*Id.* ¶ 14.) Employee Amanda Blackmon informed Plaintiff via instant messenger that coworker Samantha Temple had been talking about Plaintiff being "302'd" the day before and telling people that Plaintiff went crazy. (*Id.* ¶¶ 15, 16.) Plaintiff also asserts that coworker Jessica Hoover "stated to Temple on that day that if she threw herself down the stairs would she be able to leave early." (*Id.* ¶ 17.)

On the same day, Plaintiff spoke with Jessica Purvin about the coworkers' comments because she was uncomfortable working with them. (*Id.* ¶ 19.) Plaintiff spoke with Purvin, the Yellow Team Lead, because Bevan was out. (*Id.*) Purvin responded that she would speak with Hoover and Temple and, soon thereafter, did so, instructing them to be supportive of Plaintiff and get along. (*Id.* ¶ 20.) Purvin emailed Plaintiff on October 4th confirming that she had spoken with Hoover and Temple and telling Plaintiff that Plaintiff could contact her if she needed anything. (*Id.* ¶ 21.)

Plaintiff then went to see human resources representative Rebecca Soroka and complained about employees making comments about her mental health and that a coworker in the past had used the racially inappropriate "'N' word" two times in the workplace—in one instance her coworker Stephanie Gill used the racial slur when talking to Plaintiff and, in the second instance, Gill said it to another employee but not in Plaintiff's presence. (*Id.* ¶¶ 22-25.) Soroka remembers that, in the meeting, Plaintiff complained about the mental health related comments, the stairs comment, and being uncomfortable with Hoover and Temple. (*Id.* ¶ 26.) Soroka testified that she followed up with Purvin to confirm that Purvin had spoken with Hoover and Temple about Plaintiff's concerns and that it was not going to happen again. (*Id.* ¶ 27.) Soroka denies that Plaintiff said anything about racist comments by Gill. (*Id.* ¶ 28.)

On Monday October 14, 2019, Bevan returned to work after being out since October 2, 2019, and was told by Gill that she had observed Plaintiff with a gun in the workplace in the past—she had the weapon inside her purse and showed it to Gill with Hoover present. (*Id.* ¶¶ 30, 33.) Bevan then went to his manager, Service Manager Kristi Skovronski, to tell her what Gill had stated about the gun in the workplace. (*Id.* ¶ 31.) Bevan spoke with Hoover to confirm that she had seen the gun. (*Id.* ¶ 34.) Afterward, Bevan, Skovronski and Soroka met with Gill to confirm that she had seen Plaintiff with the gun inside the workplace at some prior date. (*Id.* ¶ 35.) They then met with Hoover to do the same and she confirmed that Plaintiff had pulled the gun out of her purse and showed it to them. (*Id.* ¶

35.) Gill and Hoover then submitted statements to Soroka about Plaintiff having shown them a gun. (*Id.* ¶ 36.)

Bevan, Soroka, and Skovronski met with Plaintiff on either October 14, 2019, or October 15, 2019, and advised her that they needed to assess the situation. (*Id.* ¶ 37.) On either the same day or the day after the meeting with Plaintiff, Soroka testified that she spoke with her supervisor, Janine Yanoski, and Yanoski made the decision to terminate Plaintiff.[3] (*Id.* ¶ 38.) Yanoski testified that she consulted with her supervisor, Loretta O'Hara about the situation relayed by Soroka and the decision was to terminate Plaintiff.[4] (*Id.* ¶ 39.) Yanoski testified that she had no knowledge that Plaintiff had any mental health condition or that she made complaints about racial comments in the workplace up to and through the time of Plaintiff's termination. (*Id.* ¶ 40.)

During the October 15, 2019, call informing Plaintiff of her termination, Plaintiff complained that the termination was "retaliation" because two employees reported the gun incident and she had reported two employees for allegedly harassing her about mental health issues.[5] (*Id.* ¶ 42.) Plaintiff did not know who the employees were who reported

---

[3] While Plaintiff agrees that Soroka testified that Yanoski made the termination decision, she disagrees about the accuracy of the testimony in that evidence supports a conclusion that Soroka, Skovronski, Bevan, and Drust made the termination decision. (*See* Doc. 24 ¶ 38.)

[4] As with Soroka's statement referenced in note 3, Plaintiff agrees that Yanoski testified as to who made the termination decision but disagrees as to the accuracy of the testimony. (*See* Doc. 24 ¶ 39.)

[5] The two employees reported for making mental health comments were Samantha Temple and Jessica Hoover. *See supra* p.3.

seeing the gun when she made the statement about retaliation. (*Id.*) Plaintiff also testified that she stated during the call that she believed she was being terminated for reporting her mental health condition to the company. (Doc. 18-2 ¶ 43; Doc. 24 ¶ 42.) Yanoski testified that she did not know about Plaintiff's complaints of harassment based on her mental health up to and through the time of Plaintiff's termination. (Doc. 18-2 ¶ 44.)

## III. Standard of Review

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

As noted previously, Plaintiff's Complaint contains three counts: Count I for Violations of the Americans with Disabilities Act ("ADA") based on "Actual/Perceived Disability Discrimination, Retaliation, and Hostile Work Environment"; Count II for Violation of Title VII based on retaliation; and Count III for Violation of Section 1981 based on retaliation. (Doc. 1 at 6-8.) The Court will address each in turn.

### A. ADA Claims

Defendant first contends that Plaintiff cannot prevail on the ADA discrimination, retaliation, and hostile work environment claims raised in Count 1. (Doc. 19 at 7.) Plaintiff withdraws her ADA hostile work environment claim. (*See* Doc. 23 at 4 n.1.) Therefore, the Court will address only her ADA discrimination and retaliation claims.

**1. ADA Discrimination**

Pursuant to the ADA, "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA protects a job applicant "not only if he is mentally impaired, but also if an employer wrongly 'regard[s]' him as impaired. 42 U.S.C. § 12102(1)(C). The test is whether the employer 'perceived' him as impaired, 'whether or not the [perceived] impairment limits or is perceived to limit a major life activity.' § 12102(3)(A)." *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021).

These claims are analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. *Gibbs*, 19 F.4th at 298 (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995)); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (disparate treatment claims under the ADA are governed by standards applicable to Title VII claims). To survive summary judgment, the plaintiff must first satisfy the elements of the prima facie case: 1) she was disabled or perceived to be disabled; 2) she was qualified for her position; and 3) she has suffered an adverse employment action because of the disability or perceived disability. 19 F.4th at 299 & n.3. If the plaintiff satisfies these elements, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* The plaintiff may then prevail on summary judgment only if she

has evidence that the defendant's proffered reason is a pretext for discrimination, "meaning evidence that could cause a jury 'either to disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* (quoting *Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 668 (3d Cir. 1999)).

For purposes of the pending Motion, Defendant does not contest that Plaintiff meets her prima facie burden. (Doc. 19 at 11.) The focus of Defendant's argument is that Plaintiff cannot show that Defendant's proffered reason for terminating her was a pretext for discrimination. (*See* Doc. 19 at 11-12; Doc. 25 at 6-9.) Plaintiff maintains that strong evidence exists which shows that Defendant's reason was pretextual. (Doc. 23 at 17-21.) Defendant contends that "Plaintiff cannot point to evidence that Defendant failed to justifiably and solely rely on the reports of her possessing and displaying a handgun in the workplace to make the termination decision" and posits that "Plaintiff may point to the fact that the incident of the gun being displayed occurred 4-5 months prior to termination, but importantly when management became aware of the incident on October 14, 2020 it terminated one day later." (Doc. 19 at 12.)

Defendant's argument on this issue does not show it is entitled to summary judgment on the ADA discrimination claim because Plaintiff has pointed to genuine issues of material fact which preclude summary judgment on the claim. In her response to Defendant's

statement that Yanoski made the ultimate decisions regarding terminations and directed Soroka to terminate Plaintiff in this case (Doc. 18-2 ¶ 38), Plaintiff points to the following:

- Defendant's sworn Interrogatory responses state that Soroka, Bevan, Tracy Drust (*hereinafter* "Drust") and Skovronski were the only individuals who made the decision or played a role in the decision to end/terminate Ms. Basora's employment. *See* Defendant's Interrogatory Responses, attached hereto as "Exhibit W" at pg. 4 [Interrog. No. 3(A)];

- Soroka testified that neither she, Skovronski, Bevan, nor Drust played any role in the decision to terminate Ms. Basora. *See* Soroka Dep. (Exhibit D) at pp. 46:24—47:8;

- Skovronski denied making the decision to terminate Ms. Basora or playing any role in the decision, and testified that it was "either Becky Soroka or Janine Yanoski." Skovronski Dep. (Exhibit E) at p. 34:18-22;

- Bevan testified that he did not recommend the termination of Ms. Basora. *See* Bevan Dep. (Exhibit G) at pp. 11:23—12:1;

- Bevan testified that Yanoski and Soroka were the two individuals who discussed Ms. Basora's termination and made the decision to terminate her, and that neither of those individuals asked Bevan for his opinion on whether Ms. Basora should be terminated. *See* Bevan Dep. (Exhibit G) at pp. 33:13—34:2;

- Drust denied playing any role in the decision to terminate Ms. Basora. *See* Drust Dep. (Exhibit CC) at p. 20:1-3;

- Soroka claimed Yanoski made the decision to terminate Ms. Basora. *See* Soroka Dep. (Exhibit D) at p. 46:6-11;

- Yanoski denied making the decision to terminate Ms. Basora, and claimed O'Hara made the decision. *See* Deposition Transcript of Janine Yanoski (hereinafter "Yanoski Dep."), attached hereto as "Exhibit Y," at p. 18:1-10.

(Doc. 24 ¶ 38.) Based on the foregoing evidence, Plaintiff concludes that

> when the facts are viewed in the light most favorable to Ms. Basora, it was Soroka, Skovronski, Bevan (and Drust) who made the termination decision. These individuals (with the exception of Drust who testified she just "signed off" on the termination after the fact) were aware of Ms. Basora's disabilities and complaints of discrimination. *See* Drust Dep. (Exhibit CC) at pp. 9:22-24, 10:19-24, 11:1-9, 19:22—20:3. Soroka and Skovronski were certainly aware of Ms. Basora's medical conditions and complaints of discrimination. *See* Pl. Dep. (Exhibit B) at pp. 36:16-20, 46:13-15; *see also* Soroka Dep. (Exhibit D) at pp. 20:19—21:3, 22:22—23:3. Although Bevan was out for the birth of a child during the majority of the events, he learned of Ms. Basora's mental health conditions and complaints of discrimination upon his return on October 14, 2019. *See* Bevan Dep. (Exhibit G) at pp. 20:14—21:23.

(Doc. 23 at 20.)

Defendant replies that the alleged inconsistencies about who made the decision to terminate Plaintiff do not "in and of themselves . . . give rise to inference of pretext." (Doc. 25 at 7-8 (citing *Yoho v. Bank of N.Y. Mellon Corp.*, Civ. A. No. 2:17-cv-917-NR, 2020 WL 73366579 (W.D. Pa. Dec. 14, 2020)).) Defendant also asserts that "the Interrogatory response established three people who participated in the decision but further deposition testimony showed that the decision was approved by offsite corporate human resources personnel. *See* Defendant Statement of Material Facts at ⁋⁋ 37-40. The testimony show [sic] as [sic] consistent practice of termination approval and not pretext." (Doc. 25 at 8.)

Defendant's reliance on *Yoho* is unavailing in that the divergent reports of who made the decision to terminate Plaintiff in this case point to disputed issues of material fact. (*See* Doc. 18-2 ¶¶ 33, 39; Doc. 24 ¶¶ 33, 39; Doc. 23 at 19-20.) Defendant's explanation of the decisionmaking process is problematic in that it does not clarify who made the final decision and how it was made. Notably, Defendant relies on Yanoski's lack of knowledge about

Plaintiff's mental health problems and reports of discrimination as an indicator that she could not have had discriminatory animus toward Plaintiff (Doc. 19 at 11; *see also* Doc. 18-2 ¶¶ 40, 44), but this reliance is unfounded without consideration of what others who admittedly participated in the decision knew. Because the animus of an employee who was not the ultimate decisionmaker is relevant if that individual influenced the decisionmaker, *McKenna v. City of Phila.*, 649 F.3d 171 (3d Cir. 2011) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011); *Jones v. SEPTA*, 796 F.3d 323, 330 (3d Cir. 2015) (discussing *McKenna's* extension of *Staub's* "cat's paw" theory of liability to Title VII context), without knowing who the decisionmaker was, what the decisionmaker knew, and who informed the decision, the full motivation for the decision cannot be ascertained.

Further, a violation of the ADA can be found if Plaintiff's real or perceived mental health condition played a role in the decision to terminate her even if other considerations played a more significant role. The ADA precludes discrimination "*because of* the disability," 42 U.S.C. § 12112(a), and this language does not mean "solely because of." *Miller v. CIGNA Corp.,* 47 F.3d 586, 593–594 (3d Cir.1995) ("Congress, by using the phrase 'because of,' did not mean 'solely because of'" in Title VII context); *Kissell v. Am. Fed'n of State, Cnty. & Mun. Emps., Dist. Council 84, AFL-CIO, Council 13*, 90 F. App'x 620, 622 (3d Cir. 2004) (based on the "because of" language in 42 U.S.C. § 2000e-2(a), "Title VII jurisprudence does not require a plaintiff's sex to be the sole motivation or even the primary motivation for the harassment."); *Shaner*, 204 F.3d at 500 (disparate treatment claims under

the ADA are governed by standards applicable to Title VII claims). Because Soroka, Skovrinski, and Bevan--employees who admittedly participated in the decision (*see* Doc. 25 at 8)--allegedly knew of Plaintiff's mental health issues (*see* Doc. 19-2 ¶¶ 12, 13, 22, 23; Doc. 24 ¶¶ 12, 13, 23, 40; Doc. 23 at 20) and became aware of those issues a short time before reports of the gun incident arose (*see id.*), whether their knowledge played a role in the decision to terminate Plaintiff cannot be determined on the current record.

For the foregoing reasons, the factual disputes related to who made and informed the decision to terminate Plaintiff precludes summary judgment on Plaintiff's ADA discrimination claim. With this determination, further discussion of the parties' arguments related to this claim is not warranted.

**2. ADA Retaliation**

Defendant's request for summary judgment on Plaintiff's ADA retaliation claim fails for a similar reason. Defendant states the following:

> Where . . . no direct evidence exists of retaliation, a plaintiff must establish a prima facie case of retaliation by "show[ing] that (1) she engaged in protected activity, (2) the employer took a materially adverse action against her, and (3) there was a causal connection between the protected activity and the employer's action." *LeBoon v. Lancaster Jewish Cmty.Ctr. Ass'n*, 503 F.3d 217, 231 (3d Cir. 2007). At issue in this case is the third prong, Plaintiff reporting the alleged harassing conduct by Hoover and Temple and Plaintiff's termination two weeks later. While this two week temporal proximity can create an inference of discrimination to defeat summary judgement, in order to show discriminatory animus Plaintiff must show the decision maker had knowledge of her report of discrimination.
>
> The Third Circuit has held that a plaintiff ["]cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir.

> 2015). In the instant matter, the record is clear the individual responsible for the termination, Janine Yanoski, did not know about any complaints made by Plaintiff about comments relating to her mental health by co-workers. [SMF at ¶¶44.] Where such evidence is unrebutted, Plaintiff cannot meet her burden to establish a causal connection between the protected activity and the adverse action and the claim must fail. *Id.* at 19.

(Doc. 19 at 13-14.)

Defendant's argument on this issue fails because, as discussed above, it is disputed whether Janine Yanoski made the decision to terminate Plaintiff and how she made the decision. Therefore, Defendant has not satisfied its burden of showing that it is entitled to summary judgment on Plaintiff's ADA retaliation claim.

**B. <u>Title VII and 42 U.S.C. § 1981 Retaliation Claims</u>**

Defendant asserts that Plaintiff's claims for retaliation under Title VII in Count II and under 42 U.S.C. § 1981 in Count III fail for the same reason that her ADA retaliation claim fails. (Doc. 19 at 14.) Therefore, for the reasons previously stated, Defendant has not shown that it is entitled to summary judgment on Plaintiff's additional retaliation claims.

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment as to All Causes of Action of Plaintiff's Complaint (Doc. 18) will be denied. A separate Order will enter.

Robert D. Mariani
United States District Judge